IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

James Caron Butler, Ben Gordon, Anthony Tolliver,
and Derrick Williams, individually, and on behalf of
all others similarly situated,

Plaintiffs,

v.

National Basketball Association, Atlanta Hawks, LP,
Banner Seventeen LLC, Bobcats Basketball, LLC,
Chicago Professional Sports Limited Partnership,
Cavaliers Operating Company, LLC, Dallas Basketball
Limited, The Denver Nuggets Limited Partnership,
Detroit Pistons Basketball Company, Golden State
Warriors, LLC, Rocket Ball, Ltd., Pacers Basketball,
LLC, LAC Basketball Club, Inc., The Los Angeles
Lakers, Inc., Hoops, L.P., Miami Heat Limited
Partnership, Milwaukee Bucks, Inc., Minnesota
Timberwolves Basketball Limited Partnership, New
Jersey Basketball, LLC, New Orleans Hornets NBA
Limited Partnership, Madison Square Garden, L.P.,
Professional Basketball Club, LLC, Orlando Magic,
Ltd., Philadelphia 76ers, L.P., Suns Legacy Partners,
L.L.C., Trail Blazers, Inc., Sacramento Kings Limited
Partnership, San Antonio Spurs, L.L.C., Maple Leaf
Sports & Entertainment Ltd., Jazz Basketball
Investors, Inc., and Washington Bullets, L.P.,

Defendants.

Civil Action No:

11.3352 PJS/SER

CLASS ACTION
COMPLAINT

JURY TRIAL
REQUESTED

---

Plaintiffs, by their undersigned attorneys, for their Complaint herein allege as

follows:

SCANNED
NOV 1 5 2011
U.S. DISTRICT COURT MPLS



**INTRODUCTION**

1.      Plaintiffs are filing this class action to redress violations by each defendant of the federal antitrust laws and applicable state contract and tort laws. Plaintiffs are four professional basketball players, and similarly situated players who have entered into, and/or who seek to enter into, player contracts with National Basketball Association ("NBA") teams.

2.      Defendants, the NBA and its separately-owned and independently-operated member teams, have jointly agreed and conspired to deny Plaintiffs the ability to provide and/or market their services in the major league market for professional basketball players through an unlawful group boycott and price-fixing arrangement.

3.      The NBA Defendants' anticompetitive agreements include a boycott that has eliminated competition in the free agent marketplace for players no longer under contract, as well as a boycott of rookie players seeking an NBA contract for the first time. The NBA Defendants have also conspired to refuse to deal with or to honor the contracts of players who have NBA contracts.  The anticompetitive purpose of this group boycott is to coerce Plaintiffs and the other players to succumb to a new anticompetitive system of player restraints which will, among other things, drastically reduce player compensation levels below those that would exist in a competitive market.

4.      The group boycott, concerted refusal to deal and price-fixing which Defendants are carrying out are per se illegal acts under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Should these anticompetitive agreements be alternatively evaluated under the "quick look" or even a full blown rule of reason test, they would still be illegal.  As a

2

result of Defendants' anticompetitive agreements, Plaintiffs and other similarly situated current and future professional basketball players who are employed by or seeking employment with an NBA club will be prevented from offering or providing their services in a competitive market and from receiving a competitive market value for their services, and will be denied the freedom of movement available to employees in virtually every other industry in the United States.

5.    The NBA Defendants cannot defend their violations of the federal antitrust laws by hiding behind the non-statutory labor exemption to the antitrust laws. Under Supreme Court precedent and settled law in this Circuit, that exemption only conceivably applies as long as a collective bargaining relationship exists between the NBA Defendants and the players.  Here, however, the collective bargaining process and relationship have completely broken down, and the NBA players have exercised their labor law right <u>not</u> to be in a union.  Specifically, after more than two years of futile bargaining, and the refusal of the NBA to negotiate any further, the NBA players ended the role of the National Basketball Players Association ("NBPA") as their collective bargaining representative and no longer have a collective bargaining relationship with the NBA Defendants.  The consequence is that any labor exemption to the antitrust laws no longer applies.

6.    Independent of their federal antitrust violations, the NBA Defendants' boycott also gives rise to state law contractual and tort claims on behalf of Plaintiffs and class members.  There is no "labor exemption" or any other legal justification for the NBA Defendants agreeing not to adhere to the terms of operative player contracts and to

3

interfere with the right of players not under contract to seek employment for their

services as professional basketball players.

## JURISDICTION AND VENUE

7.     These claims arise and are brought under Sections 4 and 16 of the

Clayton Act, 15 U.S.C. §§ 15, 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C.

§ 1, as well as applicable state contract and tort laws.

8.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and

1367.

9.     Venue in this action is proper pursuant to 28 U.S.C. § 1391 and 15

U.S.C. § 22.  Each of the Defendants can be found, resides, has an agent, or transacts

business in the District of Minnesota, and the unlawful activities were or will be carried

on in part by one or more of the Defendants within this district.  Additionally, Plaintiff

Anthony Tolliver is employed within this district by the Minnesota Timberwolves.

## THE PARTIES

10.     Plaintiff James Caron Butler is a professional basketball player who is

a free agent who last played with the Dallas Mavericks and lives in Racine, Wisconsin.

11.     Plaintiff Ben Gordon is presently under contract with the Detroit

Pistons.  He lives in Rochester, Michigan.

12.     Plaintiff Anthony Tolliver is presently under contract with the

Minnesota Timberwolves.

13.    Plaintiff Derrick Williams was the second overall pick of the 2011 NBA draft, was selected by the Minnesota Timberwolves and has received a Required Tender from the Minnesota Timberwolves.

14.    Defendant NBA, which maintains its offices at 645 Fifth Avenue New York, New York, is an unincorporated association consisting of the 30 separately-owned and independently-operated professional basketball teams that are listed in paragraph 21.  The NBA is engaged in interstate commerce in the business of, among other things, operating the sole major professional basketball league in the United States.

15.    The other Defendants are the 30 NBA member teams in the United States and Canada, each of which, upon information and belief, is a corporation, except where noted below (collectively with the NBA, the "NBA Defendants").  Upon information and belief, each of the defendant teams is a separately-owned and independent entity which operates a professional basketball franchise for profit under the team name and in the cities set forth below:

| Defendant NBA Teams | State of Organization | NBA Franchise (City) |
|---|---|---|
| Atlanta Hawks, LP | Georgia | Atlanta Hawks |
| Banner Seventeen LLC | Delaware | Boston Celtics |
| Bobcats Basketball LLC | Delaware | Charlotte Bobcats |
| Chicago Professional Sports Limited Partnership | Illinois | Chicago Bulls |
| Cavaliers Operating Company, LLC | Delaware | Cleveland Cavaliers |
| Dallas Basketball Limited | Texas | Dallas Mavericks |
| The Denver Nuggets Limited Partnership | Delaware | Denver Nuggets |
| Detroit Pistons Basketball Company | Michigan | Detroit Pistons |

| Golden State Warriors, LLC | California | Golden State Warriors |
| Rocket Ball, Ltd. | Texas | Houston Rockets |
| Pacers Basketball, LLC | Indiana | Indiana Pacers |
| LAC Basketball Club, Inc. | California | Los Angeles Clippers |
| The Los Angeles Lakers, Inc. | California | Los Angeles Lakers |
| Hoops, L.P. | Delaware | Memphis Grizzlies |
| Miami Heat Limited Partnership | Florida | Miami Heat |
| Milwaukee Bucks, Inc. | Wisconsin | Milwaukee Bucks |
| Minnesota Timberwolves Basketball Limited Partnership | Minnesota | Minnesota Timberwolves |
| New Jersey Basketball, LLC | New Jersey | New Jersey Nets |
| New Orleans Hornets NBA Limited Partnership | North Carolina | New Orleans Hornets |
| Madison Square Garden, L.P. | Delaware | New York Knicks |
| The Professional Basketball Club, LLC | Oklahoma | Oklahoma City Thunder |
| Orlando Magic, Ltd. | Florida | Orlando Magic |
| Philadelphia 76ers, L.P. | Delaware | Philadelphia 76ers |
| Suns Legacy Partners, L.L.C. | Delaware | Phoenix Suns |
| Trail Blazers, Inc. | Oregon | Portland Trail Blazers |
| Sacramento Kings Limited Partnership, LP | California | Sacramento Kings |
| San Antonio Spurs, L.L.C. | Texas | San Antonio Spurs |
| Maple Leaf Sports & Entertainment Ltd. | Ontario, Canada | Toronto Raptors |
| Jazz Basketball Investors, Inc. | Utah | Utah Jazz |

| Washington Bullets, L.P. | District of Columbia | Washington Wizards |
|---|---|---|

## CLASS ACTION ALLEGATIONS

16.    Plaintiffs James Caron Butler, Ben Gordon, Anthony Tolliver and Derrick Williams (collectively "Plaintiffs") are representatives of a class, as defined by Rule 23(b)(1), 23 (b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, and bring this action on behalf of themselves and the class members as described in paragraph 15.

17.    The class represented by Plaintiffs is comprised of (i) all players who are under contract to play professional basketball for an NBA team at any time from November 14, 2011 to the date of final judgment in this action and the determination of any appeal therefrom (the "Under-Contract Subclass"), (ii) all players who are not under contract with an NBA team and are seeking employment as professional basketball players for an NBA team at any time from  November 14, 2011 to the date of final judgment in this action and the determination of any appeal therefrom (the "Free Agent Subclass"), and (iii) all players who have not previously been under contract with an NBA team and, as of November 15, 2011, to the date of final judgment in this action and the determination of any appeal therefrom, are or will be eligible to play basketball as a rookie for an NBA team (the "Rookie Subclass").

18.    The class and each subclass are so numerous and geographically so widely dispersed that joinder of all members is impracticable.  There are questions of law and fact common to the class.  Plaintiffs' claims are typical of the claims of the class or

7

subclass that they represent, and the Plaintiffs will fairly and adequately protect the interests of the class or subclass that they represent. Common questions of law and fact predominate within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

19.    Each person in the class or subclass is, has been, and/or will be subject to Defendants' boycott. To the extent that in the future the NBA Defendants agreed to a different of player restraints, they would be uniformly imposed on members of the class or subclass.

20.    Except for provisions as to individual compensation and other variations which do not materially affect this action, the contracts signed by NBA players are virtually identical throughout the NBA.

21.    The prosecution of separate actions by individual members of the class would create the risk of:

(a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests within the meaning of Rule 23(b)(1) of the Federal Rules of Civil Procedure.

22.     In construing and enforcing their uniform agreements, rules and practices, and in taking and planning to take the actions described in this complaint, the Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief would be appropriate for the class as a whole within the meaning of Rule 23(b)(2).

23.     Questions of law and fact are common to the class and each of the subclasses and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages and restitution. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## NATURE OF INTERSTATE TRADE AND COMMERCE

24.     The primary business in which Defendants are engaged is the operation of major league professional basketball teams and the sale of tickets and telecast rights to the public for the exhibition of the individual and collective basketball talents of players such as Plaintiffs. To conduct this business, the NBA Defendants must compete with each other for and retain the professional services of players, such as Plaintiffs, who are signed to or are seeking to sign to contracts to play basketball for the various NBA defendant teams.

25.     The business of major league professional basketball is distinct from other professional sports businesses, as well as from college and minor league

9

professional basketball. Its distinguishing features include: the rules of the sport and the season during which it is played; the talents of and rates of compensation for the players, for whom playing basketball is their full-time profession; the nature and amounts of trade and commerce involved; and the unique demand for the NBA Defendants' games by the consuming public, both as ticket purchasers and as home viewers of and listeners to television and radio.

26.     The NBA Defendants' operation of and engagement in the business of major league professional basketball involves a substantial volume of interstate trade and commerce, including, inter alia, the following interstate activities: travel; communications; purchases and movement of equipment; broadcasts and telecasts of league games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of players and referees; and negotiations for all of the above.

27.     The NBA Defendants' aforesaid interstate transactions involve collective annual expenditures and receipts in excess of $4 billion.

28.     The Plaintiffs have been employed by and/or are seeking new employment with, or will seek future employment with, one or more of the defendant teams in interstate commerce as professional basketball players.

## BACKGROUND

### The NBA's History of Antitrust Violations

29.     The NBA Defendants enjoy a monopoly in the market for major league professional basketball in the United States. The relevant market for assessing the

restraint of trade at issue is the market for the services of major league professional

basketball players in the United States. Robertson v. National Basketball Ass'n, 67

F.R.D. 691, 694 & n.3 (S.D.N.Y.1975).  Defendants exercise monopoly power in this

market.  See Denver Rockets v. All-Pro Management, Inc., 325 F. Supp. 1049, 1067

(C.D. Cal. 1971) (holding that the NBA's four-year college rule a violation of Section 1

of the Sherman Act because, in part, the NBA did not contest that it enjoys "market

power in a degree approaching a shared monopoly" with respect to player services); see

also Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n, 95 F.3d

593, 599 (7th Cir. 1996) ("from the perspective of college basketball players who seek to

sell their skills, the teams are distinct, and because the human capital of players is not

readily transferable to other sports . . . the league looks more like a group of firms acting

as a monopsony").

30.     The NBA Defendants comprise the only major league professional

basketball association in the United States.  The NBA Defendants are the only United

States market participants for the services of major league professional basketball

players.  Together, they monopolize and/or restrain trade in, and/or have combined and

conspired to monopolize and/or restrain trade in the United States market for the services

of major league professional basketball players.  The only actual or potential competition

that exists in this market is among the separately-owned and independently-operated

NBA teams.  Rather than engaging in competition for the players' services, however, the

NBA Defendants have combined and conspired to eliminate such competition among

themselves for NBA players through a group boycott, price-fixing arrangement, and

concerted refusal to deal, the purpose and effect of which is to prevent players from offering their services to NBA teams in a competitive market and to coerce those players into agreeing to a new set of anticompetitive restraints on competition for their services.

31.     This is not the first instance of the NBA violating the federal antitrust laws in an effort to minimize its labor costs.  For example, in 1970, a group of fourteen players, led by Oscar Robertson, brought a putative class action challenging the various anticompetitive NBA employment practices, including the College Draft and free agency restrictions.  In denying the NBA Defendants' motion for summary judgment, the district court held that practically all of the restraints at issue were per se violations of the Sherman Act and were invalid, as well, under the rule of reason.  Robertson v. National Basketball Ass'n, 389 F. Supp. 867, 890-91 (S.D.N.Y. 1975).  The action resulted in the Robertson Settlement Agreement, as well as over $4.3 million to the plaintiffs in damages.  Another antitrust class action was filed against the NBA in 1987 known as the Bridgeman class action.  Bridgeman v. National Basketball Ass'n, Civ. A. No. 87-4189 (D.N.J. October 16, 1987).  That action resulted in the Bridgeman class action settlement agreement.  And, the NBA was found guilty of engaging in per se unlawful practices in the player market in Denver Rockets v. All-Pro Management, Inc., 325 F. Supp. 1049 (C.D. Cal. 1971).

**The Expiration of the 2005 NBA CBA**

32.     The last collective bargaining agreement was entered into by the NBA Defendants and the NBPA on July 29, 2005 and was set to expire on June 30, 2011 or, at the option of the NBA Defendants, could have been extended through 2012.  The

NBA Defendants declined to extend the agreement, because of its stated desire to achieve a massive "reset" in player salaries and the imposition of a new, far more restrictive set of restraints in the player market that would severely reduce competition for the services of NBA players.

33.     The 2005 CBA provided players with approximately 57% of all "Basketball Related Income" ("BRI"), generally, income received as a result of basketball operations.

34.     Since at least 2009, the NBA has expressed its unhappiness with the CBA to the NBPA and indicated its intention to seek a massive reduction in player salaries and a far more restrictive market for players.  The NBA sought to begin early negotiations for a new collective bargaining agreement and such negotiations, in fact, began by February of 2010.  Such negotiations continued for almost twenty months, but ultimately proved to be futile.

35.     On July 1, 2005, when the 2005 CBA expired, the NBA Defendants decided to impose a "lockout" of all NBA players.  The stated purpose of this conduct is to massively roll back player salaries and coerce the NBA players into agreeing to a new onerous set of restraints on the market for player services.  The NBA Defendants have repeatedly and publicly stated that their goal is to increase their profit margins by reducing the amount of money they pay to their players and by subjecting them to a new set of anticompetitive player restraints.

**The Breakdown of Collective Bargaining, The End of the Union and The NBA's Group Boycott.**

36.     The NBPA spent almost two years attempting to negotiate a new CBA with the NBA Defendants.  Since July 1, 2011 alone, scores of collective bargaining sessions have taken place.  Twice, the Federal Mediation and Conciliation Service was brought in to try to achieve a collective bargaining agreement.  All of these bargaining efforts, however, proved to be fruitless and no new CBA could be negotiated.

37.     On November 10, 2011, the NBA presented its final bargaining ultimatum which, among other things, would have reduced the players' share of BRI from 57% to 50% and imposed a new set of restrictions on player competition that would have wiped out the competitive market for most NBA players.  The NBA informed the NBPA that it was making this final "revised" offer for just a few days and that if the NBPA did not accept this offer by the following Monday or Tuesday, the offer would be withdrawn and replaced with an even more onerous offer that would reduce the players' BRI share to 47% and impose what amounted to a hard salary cap.  The NBA also indicated that its offers would continue to get worse as time went on. The NBA unequivocally stated that it would not entertain any counter-offer from the NBPA to its final "take it or leave it" proposal.  Instead, the NBA declared that further bargaining over these terms was at an end.

**Renunciation of any Collective Bargaining Representation by the NBA Players'
Union**

38.     With the NBA having declared that it would not further bargain, the
NBA Players concluded that the collective bargaining process had failed and that
maintaining a collective bargaining relationship with the NBA was no longer in the
interest of NBA players.  Accordingly on November 14, 2011, the Board of Player
Representative of the NBPA met and took action to immediately terminate the NBPA's
status as the players' collective bargaining representative effective at 12 noon, Eastern
time on November 14, 2011.

39.     Specifically, a substantial majority of NBA players had previously
signed authorization cards to empower the NBPA to disclaim the NBPA's role as the
collective bargaining representative of NBA players if  it was  determined that it was no
longer in the best interests of NBA players to remain in a union.

40.     On November 14, 2011, the Executive Committee of the NBPA,
along with the Board of Player Representatives, unanimously determined that the
collective bargaining process had failed and had no further prospect of achieving an
agreement.  They therefore voted to immediately have the NBPA disclaim interest as the
bargaining representative of the NBA players and directed the association to change its
status to that of a trade association which would not engage in any collective bargaining.

41.     On  November 14, 2011, the NBPA formally notified the NBA that
it was disclaiming interest in acting as the collective bargaining representative of NBA
players, effective as of 12 noon Eastern time on that day.  The NBPA is in the process of

amending its bylaws to prohibit it or its members from engaging in collective bargaining with the NBA, the NBA's member clubs or their agents.

42.     The NBPA will no longer represent players in grievances under the expired CBA, and players will now have to pursue or defend any grievance with the NBA or its members on an individual basis.

43.     The NBPA has also ceased the regulation of player agents and all other activities associated with being the collective bargaining representative of NBA players.

44.     The NBPA will shortly file a labor organization termination notice with the Department of Labor.  An application by the NBPA will also shortly be filed with the IRS to reclassify the NBPA for tax purposes as a professional association rather than a labor organization.

45.     Despite being informed of the above disclaimer of collective bargaining status by the NBPA, the NBA Defendants have made it clear that they intend to continue their group boycott of plaintiffs and all other NBA players and will not cease this boycott until the players agree to a new set of anticompetitive restraints and massive roll back in their salaries.  This conduct now constitutes a blatant violation of the antitrust laws.

## The NBA Defendants' Conduct Illegally Eliminates Competition in the Market for Player Services

46.     The NBA Defendants have jointly conspired and agreed to impose, a group boycott prohibiting all competition for player services, player signings, and

employment and/or a system of anticompetitive restraints on player movement, salaries, contract signings, and payment of compensation due under existing contracts.

47.     As part of this group boycott, all NBA Defendants have conspired and agreed to prevent NBA teams from negotiating, or even communicating with, or employing NBA players, thereby completely eliminating a competitive market for player services.  In addition, NBA teams have conspired and agreed not to honor existing contracts with NBA players, by not paying them and precluding their access to team facilities and personnel.

48.     Neither the existence nor the terms of the NBA Defendants' group boycott agreement is in dispute.

49.     The owners' collective purpose in imposing the group boycott is to force the now non-unionized NBA players to agree to the massive wage reductions and anticompetitive restrictions, which the NBA Defendants are seeking from the players.

50.     The prohibition on player signings and/or employment by the NBA Defendants constitutes an illegal group boycott, price-fixing agreement, and/or restraint of trade in violation of the Sherman Act, under each of the per se, "quick look" and rule of reason standards.

**The NBA Defendants' Anticompetitive Behavior Is Not Protected by Any Labor Exemption**

51.     The NBA Defendants are expected to argue, as they have in the past, that their anticompetitive restraints are immune from antitrust scrutiny because of

the non-statutory labor exemption defense.  However, the law makes clear that no such

defense is available here.

> 52.     This Court in <u>McNeil v. National Football League</u>, 764 F. Supp.

1351 (D. Minn. 1991), found that the following actions taken by NFL players ended the

collective bargaining relationship with the NFL:

> On November 3, 1989, the NFLPA's Executive Committee voted to
> renounce collective bargaining.  On November 6, 1989, the Committee
> advised the NFL Defendants that it would no longer engage in collective
> bargaining or represent players in grievances.  Next, approximately sixty-
> two percent of the active players signed petitions revoking the authority of
> the NFLPA or any other entity to engage in collective bargaining on their
> behalf.  On December 5, 1989, the NFLPA's player representatives
> unanimously adopted new bylaws that ended the organization's status as a
> collective bargaining representative.  Under the new bylaws, no officer,
> employee or member of the NFLPA is authorized to discuss, deal or
> negotiate with the NFL or any of its member clubs or their agents.  The
> NFLPA thus terminated its status as a labor organization. Reflecting its
> change in character and purpose, the NFLPA filed a labor organization
> termination notice with the United States Department of Labor.  The
> Internal Revenue Service also changed the organization's tax-exempt status
> from that of a "labor organization" under § 501(c)(5) of the Internal
> Revenue Code to that of a "business league" under § 501(c)(6).

<u>Id.</u> at 1356.

> 53.     Just earlier this year, in <u>Brady v. NFL</u>, this Court similarly observed

in the context of a preliminary injunction determination, that the non-statutory labor

exemption would end with their disclaimer of union status by the NFLPA.  <u>Brady v.

NFL</u>, 779 F. Supp. 2d 992 (D. Minn. 2011) ("And in contrast to the murky boundaries

presented by an impasse that occurs within an ongoing collective bargaining process, the

dissolution of the Players' former Union provides a clear boundary demarcating the end

of collective bargaining under labor law.").

54.     The NBA players have similarly taken action to end their collective bargaining relationship with the NBA Defendants.  Indeed, the NBA players have only done so after enduring a lockout for more than four months and having the NBA declare that it was no will negotiate about its "final" take it or leave it offer.

55.     The Supreme Court of the United States has indicated that the non-statutory labor exemption ends when a collective bargaining relationship has collapsed, such as is the case here.  As stated by the Court:

> [A]n agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process.  See, e.g., 50 F.3d, at 1057 (suggesting that exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union). . . .

Brown v. Pro Football, Inc., 518 U.S. 231, 250 (1996) (emphasis added).  Here, the collective bargaining process and relationship have completely broken down, and the NBA players have exercised their labor law right not to be in a union.  The non-statutory labor exemption thus no longer applies and offers the NBA Defendants no basis to avoid liability for its group boycott of NBA players under the federal antitrust laws.

**The Injuries of Plaintiffs and the Class**

56.     Upon information and belief, the NBA Defendants intend to continue to impose their group boycott in the U.S. market for the services of major league professional basketball players unless and until the players agree to the anticompetitive set of restrictions and massive salary reductions being sought by the Defendants.  Absent this group boycott, the Plaintiffs and class members would be free to work in the 2011

NBA season and to offer their services to NBA teams in a competitive market.  Plaintiffs

and class members will suffer severe damages, totaling billions of dollars, if they are

prevented from offering their services in a competitive market to NBA teams. Other

injuries being suffered by the Plaintiffs and Class are irreparable, as there is no

replacement for a lost NBA season in their short careers.

**The Plaintiffs**

57.  Plaintiff James Caron Butler, a member of the Free Agent Subclass,
is currently a free agent who last played with the Dallas Mavericks.

58.  Plaintiff Ben Gordon, a member of the Under-Contract Subclass, is
currently under contract with the Detroit Pistons.

59.  Plaintiff Anthony Tolliver, another member of the Under-Contract
Subclass, is currently under contract with the Minnesota Timberwolves.

60.  As a result of Defendants' boycott, the NBA Defendants are in
breach of, and tortiously interfering with, Mr. Gordon's and Mr. Tolliver's contracts.

61.  Plaintiff Derrick Williams, a member of the Rookie Subclass, has
been drafted by the Minnesota Timberwolves.

62.  Defendants' boycott may also prevent all of the Plaintiffs from
playing for any NBA team during the 2011–2012 NBA season or beyond.

## COUNT I

### Violation of Section 1 of the Sherman Act

63.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 62.

64.     There is a relevant market for the services of major league professional basketball players in the United States.  The group boycott orchestrated by the NBA Defendants is substantially restraining and injuring competition in that market and will continue to do so.

65.     The group boycott constitutes an agreement among competitors to eliminate competition for the services of major league professional basketball players in the United States and to refuse to pay contractually-owed compensation to players currently under contract with the NBA Defendants for the 2011 season and beyond, in violation of Section 1 of the Sherman Act.

66.     The NBA Defendants' conduct operates as a perpetual horizontal group boycott and price-fixing agreement, which is per se unlawful.

67.     The NBA Defendants' conduct also constitutes an unreasonable restraint of trade under the "quick look" or rule of reason tests.  The NBA Defendants have significant market power in the relevant market.  Their group boycott and price-fixing agreement is a naked restraint of trade without any pro-competitive purpose or effect.  In fact, its objective is to reduce player wages and increase the profits of the NBA Defendants through the imposition of a concerted refusal to deal.  Moreover, the

agreement is not in any way necessary for the production of NBA basketball or the achievement of any pro-competitive objective.

68.     Each of the NBA Defendants is a participant in this unlawful combination or conspiracy.

69.     The Plaintiffs and class members have suffered and will suffer antitrust injury to their business or property by reason of the continuation of this unlawful combination or conspiracy.  The NBA Defendants' boycott has injured and will continue to injure Plaintiffs and class members by depriving them of the ability to work as, receive contractually-mandated compensation for, and/or offer their services as professional basketball players in a free and open market.

70.     Monetary damages alone will not be adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting permanent injunctive relief.

71.     The conduct of the NBA Defendants is causing and threatens to cause monetary injuries to Plaintiffs and other class members that will total billions of dollars if the defendants continue their boycott for the entire 2011 NBA season.

## COUNT II

### Breach of Contract

72.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71.

73.     Plaintiffs and the Under-Contract Subclass include players who, as of July 1, 2011, are under contract to play professional basketball for an NBA team in

22

what would have been the 2011 NBA season and thereafter. Pursuant to their group boycott, NBA teams are preventing members of the Under-Contract Subclass from working as professional basketball players and will refuse to pay them the compensation mandated by their existing contracts. The aforesaid conduct violates the individual state contract laws that apply to these contracts.

74.     Plaintiffs and the Under-Contract Subclass members will be damaged by the NBA Defendants breaches of their contracts by a failure to receive amounts that are contractually owed, and also by being deprived of the opportunity to play professional basketball and further demonstrate their abilities on the basketball field.

75.     Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

76.     The conduct of the NBA Defendants has caused monetary injuries to Plaintiffs and other class members, entitling them to damages for, among other things, their lost compensation.

### COUNT III

### Tortious Interference with Contract

77.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 76.

78.     Each of the NBA Defendants was aware of the contracts entered into by Plaintiffs Gordon and Tolliver and the members of the Under-Contract Subclass

with individual NBA teams.  The NBA Defendants then intentionally procured the breaches of those contracts with improper motive and without justification.

79.     By jointly conspiring and agreeing to refuse to make contractually-owed payments, each of the NBA Defendants intentionally interfered with the rights of those Plaintiffs and class members with NBA Player Contracts for the 2011 NBA season to receive the compensation and other benefits due under those contracts.  Absent these restrictions, the Plaintiffs and Subclass members with NBA Player Contracts for the 2011 season would have received payments mandated by their contracts with NBA teams. Plaintiffs Gordon and Tolliver and Under-Contract Subclass members have suffered injury as a result of the NBA Defendants' actions.

80.     Plaintiffs and Subclass members with 2011 NBA Player Contracts have suffered significant and irreparable injury as a result of the NBA Defendants' tortious interference with contract.  Among other things, these Plaintiffs and Subclass members are being deprived of the ability to practice and compete as NBA players during their very short NBA careers.

81.     Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

82.     The conduct of the NBA Defendants has caused monetary injuries to Plaintiffs and other class members, entitling them to damages for, among things, their lost compensation.

83.     The NBA Defendants' tortious interference with contract violates

tort laws in the states in which such conduct is taking place.

## COUNT IV

### Tortious Interference with Prospective Contractual Relations

84.     Plaintiffs repeat and reallege each of the allegations contained in

paragraphs 1 through 83.

85.     By jointly conspiring and agreeing to impose a group boycott, each

of the NBA Defendants intentionally interfered with the rights of Plaintiffs Butler and

Williams and Free Agent Subclass and Rookie Subclass members to enter into

prospective contracts with NBA teams.  Absent these restrictions, these Plaintiffs and

subclass members, in reasonable probability, would have entered into contracts with

NBA teams.

86.     The aforesaid conduct was taken intentionally by the NBA

Defendants and is improper as it is intended to harm the players and earn monopoly

profits for the NBA Defendants by suppressing the market for player services in violation

of federal law.

87.     Plaintiffs Butler and Williams and the Free Agent and Rookie

Subclass members will be injured by the deprivation, by reason of the restrictions

imposed by the NBA Defendants, of the ability to negotiate and enter into contracts with

NBA teams.  These Plaintiffs and Free Agent Subclass and Rookie Subclass members

will suffer severe and irreparable harm if they are prevented from entering into contracts

with NBA teams for the 2011 season or beyond.

25

88.     Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

89.     The conduct of the NBA Defendants has caused monetary injuries to Plaintiffs and other class members, entitling them to damages for, among other things, their lost compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their First Amended Complaint as follows:

1.     That the Court certify this action as a class action under Rules 26(b)(1), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure;

2.     Declaring that the NBA Defendants' group boycott violates Section 1 of the Sherman Act;

3.     Declaring that Defendants' imposition of other anticompetitive restrictions violates Section 1 of the Sherman Act;

4.     Awarding Plaintiffs and class members treble the amount of damages they sustained as a result of the violations of the antitrust laws alleged herein;

5.     Awarding Plaintiffs and class members a permanent injunction against Defendants' group boycott and other anticompetitive restrictions in violation of Section 1 of the Sherman Act;

6.     Awarding Plaintiffs and Under-Contract Subclass members the damages they sustained as a result of the NBA Defendants' breaches of contract;

7.    Awarding Plaintiffs and Under-Contract Subclass members the damages they sustained as a result of the NBA Defendants' interference with their contracts;

8.    Awarding Plaintiffs and Free Agent and Rookie Subclass members the damages they sustained as a result of the NBA Defendants' interference with their entering into prospective contracts;

9.    Declaring that the NBA Defendants are obligated to pay all contractually-owed amounts to Plaintiffs and Under-Contract Subclass members;

10.    Awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees; and

11.    Granting Plaintiffs and class members such other and further relief, including any appropriate injunctive relief, as may be appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Dated: November 15, 2011                  Respectfully Submitted,

Barbara Podlucky Berens, #209788
Just Rae Miller, #387330
Berens & Miller, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 349-6171
(612) 349-6416 (fax)

*Attorneys for Plaintiffs*

27